on to the next case on the calendar. That is United States versus Caesar. Let me just make sure counsel is here. Mr. Richardson? Yes, your honor. Great. You can see and hear all right? Yes, I can. Good. And Ms. Cassidy? No, I'm sorry. Yes, Ms. Cassidy? Yes, I'm here, your honor. Okay. And you can see and hear us all right? Yes, I can. Okay. So Mr. Richardson, you have reserved three minutes of rebuttal. So you've got seven minutes. May it please the court. My name is Ian Richardson, and I also represented the government in the district court below. The district court abused its discretion when it sentenced defendant Apolli Caesar to just 48 months imprisonment and 87% variance below the low end of the guidelines range for two separately committed and charged offenses, providing material support to a foreign terrorist organization, and later, while on pre-sentence release, obstructing the investigation of her efforts to recontact supporters of that foreign terrorist organization. The district court committed two errors, which render the sentence... Mr. Richardson, may I just interrupt? You don't mind, but I want to jump to the end for a second and then let you come back. It'll help me orient myself. Assume for just a second that we agree with everything you're to say in the next 6.11 plus minutes. Assume that for a moment. What you're asking us for, the judge who sentenced in this case, who sentenced the defendant in this case, has retired. So my understanding is that you're asking us to remand for re-sentencing in a way that you assert is appropriate. Is that the end of your road? That's correct, your honor. Thank you. Go back to where you were. As I was saying, your honor, the district court committed two errors, which rendered the sentence substantively unreasonable. First, the district court erred when it placed extraordinary and unwarranted mitigating weight on the need for the sentence imposed to provide for Caesar's rehabilitation. And second, the district court erred with an unjustifiably discounted powerful aggravating factors, demonstrating the need for the sentence imposed to promote the other three statutory purposes of sentencing, retribution, incapacitation, and deterrence. The resulting sentence was well outside the range of permissible decisions and shockingly low. And I'll turn to the issue of rehabilitation in the first instance. The district court itself found that without access to treatment while incarcerated or unsupervised release, defendant will likely remain an unrehabilitated supporter of ISIL and a continuing danger to the United States. Despite that finding and the finding that there exists neither in prison or out of prison, the intensive disengagement and de-radicalization programs that the district court believed were necessary to rehabilitate Caesar, the district court nevertheless concluded that it considered whether any additional term of imprisonment, that it seriously questioned whether any additional term of imprisonment was warranted. And it did so because it was uniquely focused on the district court's assessment of the need for the sentence to protect the defendant from further incarceration. You talk about putting too much weight on the factor, but isn't there almost a false premise to the district court's argument? The district court says as long as the defendant gets this rehabilitation, she's not going to be re-offended. But then the district court says there is no such rehabilitation program. And so isn't there just a contradiction in what the district court says and the district court's reasoning? There's a very least significant tension. I think that the district court ultimately, the reason why it determined not to put Caesar into prison for longer was because it was concerned based on the testimony provided by Caesar's expert that additional incarceration would her mental state. And that factor is somewhat different than causing her to cease being a supporter of ISIS. Certainly the district court found that there weren't the programs available that would cause her to end her support for ISIS. And that's why I found that essentially, she would be a continuing danger to the United States. But what it was primarily concerned with imposing sentence was the risk of harm to the defendant herself. And that in the totality of the circumstances and considering the significant and powerful aggravating factors, which include the fact that in the first instance, she was convicted of a terrorism offense for connecting aspiring recruits to bona fide ISIS members, and that she herself had attempted to travel to ISIS. That is not a factor that could have borne that weight in the sentencing analysis. But she wasn't convicted of just providing material support. She was also convicted of violating her cooperation agreement with the government, of violating the terms of her pre-sentence release, and deleting communications with others and advising others to delete those communications to conceal her efforts to recontact ISIS supporters while she was on release. That, as the district court recognized, was made all the more serious by the fact that that conduct was engaged in committing a material support offense. And in the process, she also deceived the two experts who testified based on their meeting. I kind of get what you're saying here. I don't mean to keep returning to the rehabilitation program. But if there were in fact a kind of rehabilitation program that the district court described in its sentencing, might that account for all of these factors on the other side? Doesn't he say that if there was rehabilitation, none of this is really going to lead to recidivism or an ongoing threat? I think hypothetically, the existence of a rehabilitation program that was effective to achieve the result the district court wanted to achieve in this case could make it more reasonable for the district court to consider the rehabilitative factors significant in the sentencing analysis. But I still think that in light of the other statutory purposes of sentencing, the weight the district court could permissibly place on that factor. For my sake, you said that there were three others. Retribution, just for my notes, the other two are? Retribution, incapacitation, and deterrence. Thank you. Go ahead. And in this case, the government focused its sentencing argument on the need for the sentence imposed to provide for just punishment, reflect the seriousness of supporting foreign terrorist organizations, and to prevent the defendant from committing further crimes. And that's significant, particularly on this record, because the defendant is unique, as far as the government can tell, among terrorism defendants in that she had already committed new serious criminal conduct while on pre-sentence release. And she did so despite the fact that it violated a cooperation agreement. She did so despite the fact that it violated the court-ordered conditions of release. And she did so despite her own counsel's admission during her bail hearing that he would speak volumes at sentencing. And yet the district court gave that sentence, and sentencing the defendant for that offense, gave Caesar virtually no additional punishment for committing the obstruction offense. What do you mean no additional punishment? Well, the district court initially described the sentence intended to impose as 48 months imprisonment. And when it was asked to clarify how it was apportioning the sentence, it made clear that it was providing only a single month of imprisonment for the obstruction offense. And then after being alerted to section 3147 and the need to provide for a consecutive sentence, provided apportioned the sentence as 46 months for the terrorism offense, one month for the obstruction offense, and an additional month under 3147. All right. I mean, I think one of the realities, at least in this circuit, is that we don't typically second-guess district court judges when they are weighing the different 3553a factors. So an 85% variance is not that shocking. It happens, you know, with more frequency than one might imagine. And yet those are typically not cases that we are reversing for substantive unreasonableness. Is there something about terrorism that makes it different? Yes, Your Honor. I mean, as this court recognized recently in Mamouni, terrorism crimes are different. And the fact that the terrorism enhancement reflects Congress' and the Sentencing Commission's considered judgment that more severe punishment is required because of the unique risks of terrorism defendants and the unique difficulty of preventing them from reoffending. And so— But Congress could have created mandatory minimums to these things, right? Congress could have created a mandatory minimum. I think it's significant. How Congress chooses to signal its policy judgments is ultimately for Congress. It has chosen to do so here in the context of the terrorism enhancement. When Congress enacted the terrorism enhancement or directed the Sentencing Commission to enact the terrorism enhancement, the terrorism enhancement was actually mandatory. It was when the guidelines were mandatory. So at the time that Congress enacted it, Congress had every reason to believe that it would govern sentencing proceedings. But you're correct that there isn't a mandatory minimum. District judges continue to have that discretion. But in the unique circumstance of a terrorism offense, we have to give adequate weight to the seriousness of the offense. We have to give adequate weight to the unique difficulty of incapacitating terrorists and preventing them— The district court made a finding that without access to treatment while incarcerated or unsupervised release, defendant will likely remain an unrehabilitated supporter of ISIL and a continuing danger to the United States. So under the actual circumstances, in whatever treatment was available or she received, would we say based on those findings that she likely will remain an unrehabilitated supporter and a continuing danger? Or has there been the kind of program that the district court thought might happen? There has not, Your Honor. The district court identified has not come to Okay. So she's been out for how long? She's been out since July 28, 2020. So she's been out for about two and a half months at this point. All right. Let's hear from Ms. Cassidy. You reserved three minutes for rebuttal, Mr. Richardson. Good morning, Your Honors. I'd like to contest the government's contention that the judge relied overwhelmingly on one factor, which was the availability of treatment. The court relied on several circumstances. It relied on Ms. Cesar's history and characteristics, specifically her lifetime of severe sexual and physical abuse and the post-traumatic stress disorder that that caused and that motivated her conduct. It relied on the testimony of experts that it was that psychiatric condition that she had, not ideology, that was the underlying cause of her conduct. It relied on her need for intensive trauma therapy that could not be provided in prison and the expert testimony that her condition was highly treatable and would respond as trauma expert, an expert who had treated hundreds of trauma victims, that this kind of thing was highly treatable and expert testimony that de-radicalization reduces recidivism. Now, those factors, those circumstances affected all of the factors. Well, can I ask about this de-radicalization thing? So as we were just discussing, the district court says, as you say, that if she got, if she participated in one of those programs, that maybe that would help. But then he also says there is no such program. Well, there was no. Yes. And he sort of encourages the Bureau of Prisons to create one. But as far as I know, the Bureau of Prisons did not and was not under an obligation to do so. So, so isn't he relying on a false premise that this kind of program is available and will work with her? No, he's relying on an actual premise that was testified to at the hearing, which was that Daisy Khan, who runs an organization of, for, for good Muslim women and trying to make Muslim women a positive, effective voice in the under her wing when she was released and for her to obtain therapy upon her release. And Ms. Khan is doing that. I mean, right now. So there was also testimony from Ms. Khan that she doesn't have a facility. She hasn't designed a program. She's not. So how do we know that that's happening? Is anybody paying attention? Well, it is happening. Yes, people are paying attention at this point. Ms. Caesar is surrounded by a huge array of supporters. She's in constant contact with Daisy Khan and she's been offered an internship to work for Daisy Khan's organization. She's waiting for a software, monitoring software to be put on a laptop because everything's virtual and she needs a laptop to do this work. So her computer is with, this is all the information I've gotten from the defense lawyers, Ms. Von Dornum and Mr. Jacobson. Her, her laptop is, is, is currently with the probation office for installing software. She is in con, she has two therapists, one contracted to the probation department and she's also meeting with, virtually with Dr. Porterfield, I think once or once every one or two weeks. Can I interrupt? Is this in the record or you're just sort of enlightening us post? I'm enlightening you as, in response to the question, in response to the question, is, is there such a plan? And there is. The last point I'd like to make is that Ms. Caesar is in constant, and I say constant, multiple times a day communication with probation officer on a proactive basis. She initiates contact voluntarily. She's constantly sending him, can I do this? What should I do? Sending him photos of what she's doing, her baking and things like that. She's waiting for the internship. She's been actively seeking a job. I understand that she just got a job at Fresh Direct and I think started on Friday. So, so is actually doing very well. And look, I assume, I assume that's right. And that it's, that it's a, it's a, it's a, it's, it's extremely positive thing to do for her as a human being and as a prisoner and so on and so forth. But why does that possibly act as a deterrent to somebody else who's thinking of the same kind of behavior? If I'm, I'm not trying to at all be tongue-in-cheek, but, but this is the best, her committing these crimes is the best thing that's ever happened to her. How, how does that deter me if I'm somebody else trying to decide whether I'm going to engage in that sort of activity? Well, Your Honor, the court was focused mainly on protection of the I would like to get to that. But if you're speaking of general deterrence, there are always cases that fall at the end of the spectrum of mitigation and call for lenience. Every, every, we can't throw the book at everybody to send a general deterrence message. This is a highly unusual case. And, you know, this is what the Supreme Court has said in individualized. My question did be, you can go ahead on, please. But, but my question is what the extent to which the sentencing judge took general deterrence into account, not whether he's right or wrong, but, but the extent to which he folded that into the mix and in doing the sentencing, he was extraordinarily and impressively concerned with, with her, her, her welfare. And, but where, where do I find it that he took into account the deterrence and, and, and said, well, but matching it, it, it's not strong enough to affect the sentence or affect the sentence any more than it did. Well, where he considered general deterrence was in the concept of just punishment, which he did consider. The court considered and discussed the seriousness of the offense, the need to ensure specific deterrence and just punishment. And it specifically determined, and this is at SPA 46, the special appendix 46 and 48. It determined that her offenses were very serious. And for this reason, despite her tragic history, and by the way, her tragic history was the intense focus of the hearing and the government kind of glosses over that, but that was a principal justification for this sentence. But despite her tragic history and traumatic cause of her conduct, further incarceration was necessary, just as punishment, as what the government called retribution, and that includes general deterrence. And that's the defense sought time served, which was more than the sentence she would have gotten if she hadn't violated her, her bail conditions. And Judge Weinstein rejected that and said, no, the sentence in the first instance, and this is that this is again on the record at government appendix 460, must ensure that the public is protected and the defendant is adequately punished. It found after hearing from five experts that her risk of recidivism was low if she got intensive therapy because her conduct was based on severe trauma caused by years of abuse. But it rejected the argument that no further incarceration was necessary and kept her in prison for longer. Despite that, despite her need for therapy, just for punishment. Is that the one month? No, this is for more than a year longer. Okay. Yeah, it was more than a year longer. So you mentioned the violation of bail conditions, and they sound to me similar to what you just described about the oversight she's having now, right? That include electronic monitoring and life coaching at a place called Hope House, but she still violated the terms of her release and she lied about her returning to the conduct. So why does the district court have good reason to think that the same types of measures would work again? Because this is again a focus of the hearing. There was a lot of testimony about what happened when she was released. Basically, her support network fell down on the job. Her psychiatrist was away. She tried to obtain therapy. She went to a clinic. She was put on a waiting list. She had no support. Her mother had just died when she was in jail. She had literally no one. And she didn't violate her ankle bracelet. She got on Facebook. She had no one. She had no job. And she got back on Facebook and contacted all of her old Facebook contacts, not just the former ISIS people against whom she cooperated, but everybody else. Did she do anything during that time to facilitate travel from the United States to abroad? No, not while she was on release. And there was no claim that she resumed or attempted to resume support for ISIS. The only crime she committed here, and that's why I want to respond, violating her bail conditions isn't a crime. It's bad behavior, but it's not a crime. The only crime here was that she obstructed justice by lying about it. She turned in her laptop, and that's how the government found these. But she had deleted... She also used her online name for a couple of them. I think one of them initiated and asked her whether it was her, and she said, yes, it's Nutella. But she didn't agree with them. She didn't support ISIS. She said, to the contrary to one of her contacts, I used to be with ISIS. She did deny to some people that she'd done anything wrong, and said she was snitched on. She didn't want to reveal that she was cooperating. And the government makes a claim that to one of these people, she revealed her cooperation, and that's at GSA 31. And I asked the court to just read that statement. It's totally unclear what she is saying. She's saying, they wanted my information to let me out, but I'm not going back in. She's basically saying, I'm not going back to jail for anyone. I'm on the down low. It sounds as much like she's saying, I'm done. More like she's saying, I'm done with this. I'm not associated anymore. She certainly doesn't offer any support. And the government couldn't claim that. If they did, they would have charged her with something other than deleting the Facebook post, obstruction of justice. So there was a whole long hearing about that, and the court concluded that... Before we gloss over that, isn't that also very serious that she deleted these thousands of posts and hid them from the government? It's serious. It's obstruction of justice. She didn't want to get caught. She knew she'd done something wrong that she wasn't supposed to do on bail, and she deleted them. But I think they recovered all of them. They recovered deleted posts. That's the only reason they have them. They got them from Facebook. And there was no claim that there was something else going on here. She behaved badly, and she was severely... She paid for this. She was punished. She was immediately remanded. She lost her cooperation agreement and her 5K, which she would have been out already way before that. She had to plead guilty to another felony, which dramatically increased her maximum and effective guidelines range because the guidelines range was capped at 20 years before the obstruction for the actual offense of material support. So, I mean, she paid for that. And the court decided... The court definitely considered every factor and decided that her history of abuse, which was the cause of this, and the treatment that she needed, the testimony that with treatment, she wouldn't re-offend, that in these unusual, unique circumstances, prolonged incarceration wasn't necessary to achieve the purposes of retribution or just punishment or deterrence. But again, the fact is that ISIS targets people like this all the time. That's their MO, right? They find vulnerable, disaffected people, often very young people, and enlist them to do the types of things that your client did. And if the end result is that you get four years, it would seem to me to make ISIS's job a lot easier. What's the response to that? The response is that this was on the very, very extreme end of vulnerability, that this individual... And there still is individualized sentencing. It's required by the Supreme Court, individualized sentencing. And this case was the absolute extreme. In fact, Dr. Porterfeld testified, whose whole business is trauma therapy, that the level of abuse in this case was astonishing even to her. And other cases in which this court has affirmed downward variances, large downward variances for terrorism, don't even come close to this. And Bajibara, the court affirmed a large downward variance based on the motivation, which was not the result of horrible trauma, literally torture for her whole life, like was here, but was just that the defendant was motivated to save his people and not to hurt people. He was politically motivated. I have one thought, which is you said a moment ago that her support network had failed her or had fallen apart. It's why she violated bail. So when the district court, in its sentencing opinion, says over and over again, in an ideal world, she'd received this kind of support and this kind of therapy and this kind of treatment and so on, wasn't there evidence that we weren't living in an ideal world? Has all of that... Did the district court really or should it have had confidence that all of that was available this time around? Well, yes. First of all, Dr. Porterfield acknowledged that she dropped the ball and that she was unavailable for a period of time. The defense lawyers admitted that they thought she would do fine. They didn't realize how much support she needed. Nobody knew how much support she needed at the time. They thought she would be okay. They all promised a very different regime in the future and they found Ms. Kahn. Ms. Kahn entered the picture and Ms. Kahn is actually a person who works with young- Almost because of the violation of the bail conditions, it prompted all of the people around her to move into gear and offer more support? Yes. Mistakes were made, mistakes were recognized, and those mistakes aren't being repeated. She is surrounded. She's got the social worker and federal defenders constantly monitoring her. She's got two psychiatrists or psychologists and her defense lawyers are constantly on top of her, in addition to Ms. Kahn, who she's going to be working with. Judge Weinstein imposed eight years of supervised release. She is going to be under the supervision of the court for eight years and that's to make sure that this works. Thank you, Ms. Cassidy. We'll now hear from Mr. Richardson for three minutes of rebuttal. Thank you, Your Honor. I just wanted to respond briefly to an inaccuracy regarding her violations while she was out on release. The government didn't recover at least 1,000 messages that she could collect through search warrants, but many of her communications were conducted using a medium, Facebook Messenger, in which we weren't able to actually obtain the messages that she had exchanged with others. One of the things that we argued extensively in the district court is we can't be sure what she was doing when she was recontacting ISIS supporters. One of the people that she contacted, we later recovered evidence that she had engaged in a 40-minute voice call with them, and we don't know what she said or what she talked about with that person at that time. But we shouldn't have to be in doubt. The whole purpose of the conditions of release was to prevent the defendant from doing exactly that, and she in just 50 days on pre-sentence release did this. One of the other questions that's been raised is who's to blame for her conduct while on pre-sentence release. The defense has repeatedly insisted that the defendant's violations of her conditions of release were because her support network failed her, and apparently the defendant's recovery from jihadism is so tenuous that even when her psychiatrist goes on vacation for two weeks, she will immediately snap back and resume contact with ISIS supporters. That's an indication that a much longer sentence is necessary. But, you know, I have to respond to some of the points that Ms. Cassidy made about what's going on now. This isn't in the record, but the defendant is living in the same place that she was living when she committed the obstruction offense. She is, the support network is exactly the same. It's Dr. Porterfield and it's Ms. Khan, but I only know that because Ms. Cassidy said so. The probation department isn't coordinating any of that contact. When we talk to the probation department, they don't know what she's doing with Ms. Khan or with Dr. Porterfield. The mental health treatment that she's receiving is one hour virtually every week, and that is essentially what we know about what's going on right now. So we are repeating the mistakes of the past. She's living in the same location, and that was the location that Daisy Khan attributed for her problems. And this is at page 285 of the general appendix. Ms. Khan said, so we ended up sending her to another safe house. That was a mistake because she was allowed to go into a community that was not her own and was not relevant for her situation. That's the same community that she's in today. So there hasn't been a change. There isn't a comprehensive plan to prevent her from doing the same things that she did when she was on pre-sentence release. And a significant sentence was warranted and it is warranted to both deter other criminal conduct from those who would support ISIS and to prevent the defendant from recidivism. Thank you both. We will reserve decision and we'll now